The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 24, 2019

2019COA160

**No. 17CA0495, *People v. Shanks* — Evidence — Opinions and Expert Testimony — Testimony by Experts**

In this criminal appeal, a division of the court of appeals considers whether a trial court must conduct a *Shreck* hearing before admitting expert witness testimony analyzing historical cell site data.  As an issue of first impression, but consistent with most federal courts, the division holds that the use of historical cell site data to determine the general geographic location of a cell phone is widely accepted as reliable and does not require a *Shreck* hearing.  In so holding, the division distinguishes historical cell site analysis from the theory of granulization, which remains a source of controversy within the scientific and forensic communities.

Because the evidence offered at trial was within the bounds of reliable historical cell site data analysis, it was properly admitted.

The division also rejects the defendant's contentions that the district court erred in denying his motion to suppress the victim's out-of-court identification and in admitting the victim's in-court identification; that the district court violated his rights to due process, to present a defense, and to a fair trial by disallowing certain evidence in support of and not instructing the jury on an alternate suspect defense; and that the district court erred by allowing reference to his nickname during trial.

Accordingly, the division affirms the judgment of conviction.

COLORADO COURT OF APPEALS                                    2019COA160

Court of Appeals No. 17CA0495
Jefferson County District Court No. 14CR2888
Honorable Tamara S. Russell, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Charles Jenson Shanks,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE BROWN
Furman and Davidson*, JJ., concur

Announced October 24, 2019

Philip J. Weiser, Attorney General, Jillian J. Price, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Lauretta A. Martin Neff, Alternate Defense Counsel, Grand Junction, Colorado,
for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1     Defendant Charles Jenson Shanks appeals from his conviction on two counts of kidnapping, two counts of burglary, and one count each of robbery, felony menacing, assault, and false imprisonment. He contends that the district court erred by (1) admitting expert witness testimony about historical cell site analysis without first conducting an evidentiary hearing; (2) admitting an impermissibly suggestive out-of-court identification and an in-court identification based thereon; (3) excluding his alternate suspect defense; and (4) allowing the use of his nickname, "Capone," at trial.  He also contends that the cumulative effect of these errors warrants reversal.  We affirm.

¶ 2     Addressing an issue of first impression in Colorado, we conclude that expert testimony explaining how historic cell site data is used to provide a general geographic location of a cell phone at a given time may be admitted without first holding an evidentiary hearing on the reliability of the methodology.

## I.    Background

¶ 3     Shanks and his codefendant, William Cody, were charged with numerous offenses arising from the home invasion and assault of the victim.

¶ 4    The victim and Cody worked together and occasionally socialized outside of work. The victim supplied Cody with marijuana and the two men sometimes smoked marijuana together. On the night of the charged offenses, Cody called the victim to purchase some marijuana and arranged for his "sister," codefendant Arianna Eastman, to pick it up for him.

¶ 5    The victim met Eastman outside his house for the transaction. When he turned to go back inside, a masked man, whom the victim later identified as Cody, and another unmasked man followed him and forced their way inside. The two assailants searched the apartment and beat up the victim before leaving with the victim's equipment for growing marijuana.

¶ 6    A couple of days after this incident, the victim identified Shanks as the second assailant from a photo array. The victim identified Shanks again during trial.

¶ 7    A jury ultimately convicted Shanks as charged. The court sentenced him to twenty-eight years in the custody of the Department of Corrections.

## II.     Historical Cell Site Analysis

¶ 8      Shanks contends that the district court erred by admitting expert witness testimony analyzing historical cell site data without first holding a hearing to determine the reliability of the science behind such analysis.  We disagree.

### A.     Standard of Review

¶ 9      We review the district court's admission of expert testimony for an abuse of discretion and will reverse only when the decision is manifestly erroneous.  *See People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).  "This deference reflects the superior opportunity of the trial judge to assess the competence of the expert and to assess whether the expert's opinion will be helpful to the jury."  *Id.*

### B.     Applicable Law

¶ 10     A trial court determines the admissibility of expert testimony under CRE 702, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The inquiry focuses on "the reliability and relevance of the proffered evidence and requires a determination as to (1) the reliability of the scientific principles, (2) the qualifications of the witness, and (3) the usefulness of the testimony to the jury." *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001); *accord People v. Campbell*, 2018 COA 5, ¶ 40. The court must also evaluate the evidence under CRE 403, ensuring that the probative value is not substantially outweighed by the danger of unfair prejudice. *See Rector*, 248 P.3d at 1200; *Shreck*, 22 P.3d at 70.

¶ 11 The court's inquiry "should be broad in nature and consider the totality of the circumstances of each specific case." *Shreck*, 22 P.3d at 77; *accord Rector*, 248 P.3d at 1200. Although the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide helpful guidance, a court need not consider any specific set of factors when determining the reliability of the proffered evidence. *Shreck*, 22 P.3d at 78.

¶ 12 Concerns about conflicting opinions or whether a qualified expert accurately applied a reliable methodology go to the weight of the evidence, not its admissibility. *See Campbell*, ¶ 42. "Such concerns 'are adequately addressed by vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof.'"  *Id.* (quoting *Estate of Ford v. Eicher*, 250 P.3d 262, 269 (Colo. 2011)).

¶ 13     If a party requests that evidence be subjected to a *Shreck* analysis, the trial court may, in its discretion, hold an evidentiary hearing.  *Id.* at ¶ 41.  "This discretion comports with the trial court's need to 'avoid unnecessary reliability proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.'"  *Rector*, 248 P.3d at 1201 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  A hearing is not required if the court "has before it sufficient information to make specific findings under CRE 403 and CRE 702 about the reliability of the scientific principles involved, the expert's qualification to testify to such matters, the helpfulness to the jury, and potential prejudice."  *Id.*

## C.     Additional Background

¶ 14     Shanks's defense was that he was not the second assailant and that he was at a family gathering on the other side of town

(about eighteen miles southeast of the victim's house) at the time of the offense. The prosecution intended to disprove this defense by introducing evidence from Shanks's phone records and cell tower usage data to show that he was in the general area of the victim's home at the time of the offense. To do so, the prosecution disclosed investigator Kathleen Battan as an expert in "Forensic Analysis of Cellular Phone Records and Cell Tower Function and Data." Defense counsel objected and requested a *Shreck* hearing.

¶ 15    In its order denying the hearing request, the district court noted that whether a *Shreck* hearing is required to determine the admissibility of historical cell site analysis is a novel issue in Colorado. It then reviewed federal case law analyzing the issue under Fed. R. Evid. 702, which is similar to Colorado's rule for our purposes, before ruling that

> federal courts have generally required a
> pretrial hearing to determine the admissibility
> of expert testimony purporting to pinpoint the
> location of a defendant using cell phone site
> data, whereas a pretrial hearing has generally
> not been required to determine the
> admissibility of testimony merely purporting to
> place a defendant within the service radius of a
> specific tower at a certain time.

Concluding that the prosecution's proffered evidence fell into the latter category — identifying Shanks's general location when the crime was committed — the district court denied the request for a hearing.

¶ 16     Shanks renewed his objection and request for hearing multiple times, arguing that Ms. Battan based her opinion on a theory called "granulization" and the "scientifically unsupported assumption that a cell phone connects to the closest cell tower." Shanks also challenged Ms. Battan's use of pie shaped sectors rather than ovals to demonstrate the cell tower service area. Again, the district court denied the request for hearing.

¶ 17     At trial, over Shanks's objection[1], the district court accepted Ms. Battan as an expert and allowed her to testify "about forensic analysis of cellphone records . . . and also in a limited fashion about . . . cell tower function and data." The court acknowledged that Ms. Battan did not have a background in science or engineering but

---

[1] Shanks did not object to Ms. Battan's analysis of cell phone records or her mapping or identification of the cell towers used to make particular calls. Instead, Shanks objected to Ms. Battan's "analysis of sectors, what sectors mean and general technical operations of a cellphone tower."

7

concluded she did not need to "know how to design, operate or manufacture cell towers" to testify about the cell tower data she collects and "what that data tells her about cell tower function."

¶ 18    Ms. Battan testified to the following:

- Typically, a cell tower has three sectors, each covering approximately 120 degrees of a 360-degree circle around the tower. The orientation of the sector (the precise direction the sector points) is called the azimuth.

- Law enforcement has access to a database that includes the precise physical location of all cell towers and the azimuth of each sector of each tower.

- Shanks's cell phone carrier produced records that included data about when each call was made or received, how long the call lasted, and what specific sector of what cell tower was used by the cell phone to make or receive the call.

- She mapped the physical location of the cell towers used by Shanks's carrier using Google Earth; identified the towers closest to Shanks's residence, Cody's residence,

and the victim's residence; and noted that there were approximately 100 towers in between.

- Using an FBI computer program, she plotted the cell tower and sector used for each relevant call reflected in Shanks's phone records. The sectors associated with each call were reflected on the exhibits as 120-degree wedges with green lines as the general boundaries of the sector and a shaded green area between the lines. The lines *did not* depict distance from the cell tower.



---

[2] For reader clarity, we have included a map that was part of a trial exhibit reflecting how Battan mapped the sectors.

- She *cannot* state how far away a cell phone is from a given cell tower during a call or exactly where a cell phone is when it uses a particular tower.

- Many cell tower coverages overlap and a call typically will use the cell tower with the clearest and strongest signal even if that tower is not the closest. Which tower a phone uses is determined by the carrier based on a variety of factors.

¶ 19    With this background, Ms. Battan testified about and presented exhibits showing the cell towers and sectors used by Shanks's cell phone to make and receive calls before and after the attack on the victim. Between 10:36 a.m. and 4:00 p.m., Shanks's phone connected with towers near his home in Aurora. Between 4:55 p.m. and 7:39 p.m., Shanks's phone connected with towers moving west along the highways between his home and Cody's home in Lakewood. Between 9:00 p.m. and 10:08 p.m., Shanks's phone made or received six calls by connecting to a west-facing sector of a tower situated southeast of the victim's home in Edgewater. At 10:27 p.m. the victim called 911 to report the attack.

At 10:39 p.m., Shanks's phone again connected with the tower nearest Cody's home.

¶ 20    Ms. Battan performed a similar analysis of cell phone records for Cody and Eastman. Collectively, the data revealed several communications among Shanks, Cody, Eastman, and the victim from 9:04 p.m. to 9:51 p.m., and further communications between Shanks's phone and Eastman's phone between 10:02 p.m. and 10:08 p.m. Shanks's, Cody's, and Eastman's phones connected to towers near the victim's home for these communications.

¶ 21    Notably, Ms. Battan did not opine that Shanks or his phone was in any specific location at any specific time. Nor did she testify regarding the overlap in coverage between two cell towers or to the range of any tower with which Shanks's phone connected the night of the incident. She also did not testify to the typical coverage range of a tower, instead explaining generally that the range of a tower in an urban area like Denver will be much shorter than in a rural area like the middle of Kansas because of the concentration and availability of towers, heavy usage, and physical interference in urban areas. Ms. Battan did say, on cross-examination, that she believed it was impossible for Shanks's phone to be eighteen miles

11

to the southeast of the tower nearest the victim's home at the time it connected to the west-facing sector of that tower.

¶ 22    To counteract Ms. Battan's testimony, Shanks offered a competing expert, Joseph Kennedy.  Over the prosecution's objection, the district court accepted Mr. Kennedy as an expert in "radio frequency, which includes cell phone tower operations and cell phones."  Mr. Kennedy testified to the following:

- Many cell tower coverages overlap and a call typically will use the cell tower with the best call quality, even if that tower is not the closest.  Which tower a phone uses is determined by the carrier based on a variety of factors.

- Typically, a cell tower has three sectors pointing in three different directions.  No sector is precisely 120 degrees.

- One cannot say a cell phone is near a tower simply because it connects to that tower.  A cell phone can be serviced by and connect with any tower within 21.7 miles.

¶ 23    Accordingly, Mr. Kennedy opined that Shanks's cell phone could have connected to any tower within a service area of approximately twenty-one miles and that Shanks could have been

at a family gathering eighteen miles southeast of the tower nearest the victim's home when his phone pinged that tower. However, on cross-examination, Mr. Kennedy conceded the 21.7-mile coverage area decreases in urban areas and cell towers in the Denver metro area would have a more limited coverage area, possibly one to one and a half miles.

¶ 24 Finally, to rebut Mr. Kennedy's opinions, the prosecution offered special agent Scott Eicher, who is a founding member of the FBI's Cellular Analysis Survey Team, as an expert in "historical cell site data analysis." Agent Eicher agreed with Ms. Battan and Mr. Kennedy that a cell phone generally selects a tower based on signal strength and signal quality. He further testified that, although the maximum range of a cell tower may be twenty-one miles, in urban areas, the cell towers are placed in close proximity and are designed so that the signal does not go past the next tower. In other words, even in the Denver suburbs, a cell phone must be within a mile or mile and a half of a cell tower to use it. According to Agent Eicher, it was not feasible for Shanks's phone to be eighteen miles away from the tower with which it was connecting. Even so, Agent Eicher

admitted that only the general location of a phone can be discerned from the tower and sector data, not the phone's exact location.

### D. Analysis

¶ 25 Shanks argues the district court erred in admitting Ms. Battan's and Agent Eicher's testimony without first holding a *Shreck* hearing because their opinions (1) were based on the faulty assumption that a cell phone always connects to the nearest tower; and (2) were based on unreliable science and methodology.

#### 1. The Opinions Were Not Based on the Faulty Assumption that a Cell Phone Always Connects to the Nearest Tower

¶ 26 We reject Shanks's first argument — that the prosecution's experts' opinions should not have been admitted because they were based on the faulty premise that a cell phone always connects to the closest tower — because it is inconsistent with the record. During pretrial arguments concerning Shanks's request for a *Shreck* hearing, the prosecution represented to the district court that Ms. Battan would not opine that a cell phone necessarily connects to the nearest cell tower. Consistent with that representation, neither Ms. Battan nor Agent Eicher so testified at trial. Instead, both experts testified that a phone will connect with

14

the tower emitting the strongest, clearest signal.  Neither expert's opinion was based on the alleged faulty premise Shanks identifies.

### 2.    The Opinions Were Based on Reliable Methodology

¶ 27    According to Shanks, Ms. Battan's and Agent Eicher's opinions were based on unreliable science and methodology because they relied on a theory called "granulization."  To understand Shanks's argument, it is necessary to provide some background on the use of historical cell site data and its general acceptance nationwide.

¶ 28    "Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time."  *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016) (citing Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 Rich. J.L. & Tech. 3, 5 (2011)).  Essentially, a cell phone is a two-way radio that uses a cellular network to communicate.  *Id.*  Each cell site or tower has a limited geographic range, which depends on the number and height of the antennas on the cell site, topography of the surrounding land, and natural and manmade obstructions.  *Id.*

¶ 29    "In urban areas, cell towers may be located every one-half to one mile, while cell sites in rural areas may be three to five miles apart." *Id.*  A cell phone generally connects to the tower with the strongest signal, although adjoining towers may provide coverage overlap.  *Id.*  There are several factors that determine which tower a cell phone will connect with, including proximity, geography, topography, environmental factors, the technical characteristics of the relevant phone, and the number, height, and angle of antennas on the tower.  *See id.* at 295-96; *State v. Johnson*, 797 S.E.2d 557, 561-62 (W. Va. 2017).

¶ 30    "A cellphone generates 'historical' cell-site data when it places a call and connects to a specific cell tower." *United States v. Reynolds*, 626 F. App'x 610, 614-15 (6th Cir. 2015).  Phone companies maintain call detail records, which include data about the duration of the call and the tower and sector to which the cell phone connected.  *See id.* at 615; *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013); *United States v. Eady*, No. 2:12-CR-00415-DCN-3, 2013 WL 4680527, at *3 (D.S.C. Aug. 30, 2013) (unpublished opinion).  In addition, the cell service providers maintain a list of the precise location of each tower and the

specifications for each of the sectors of the tower. *See Jones*, 918 F. Supp. 2d at 5.

¶ 31    Typically, in criminal cases, the prosecution offers a witness who uses these resources to plot on a map the location of the cell tower used by an individual's cell phone for a call or series of calls. *See, e.g., United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 54 (D.D.C. 2013); *Jones*, 918 F. Supp. 2d at 4-5; *Eady*, 2013 WL 4680527, at *3; *United States v. Davis*, No. 11-60285-CR, 2013 WL 2156659, at *5 (S.D. Fla. May 17, 2013) (unpublished opinion). Often, these witnesses also will plot the specific sector to which the individual's phone connected by drawing lines coming out from each tower at a 120-degree angle. *See Machado-Erazo*, 950 F. Supp. 2d at 54; *Jones*, 918 F. Supp. 2d at 3; *Eady*, 2013 WL 4680527, at *3; *Davis*, 2013 WL 2156659, at *5. From these maps, the witness may opine that the individual's phone was likely within a general geographic location, *see Jones*, 918 F. Supp. 2d at 5, or the coverage area of a particular sector, *see Eady*, 2013 WL 4680527, at *3, at the time of each call.

¶ 32    Federal courts "that have been called upon to decide whether to admit historical cell-site analysis have almost universally done

17

so." *Hill*, 818 F.3d at 297 (collecting cases); *Machado-Erazo*, 950 F. Supp. 2d at 56 (collecting cases). Several state courts have done the same. *See, e.g., People v. Fountain*, 62 N.E.3d 1107, 1124-25 (Ill. App. Ct. 2016) (collecting cases). And a number of these courts have concluded that the methodology described above is widely accepted as reliable and may be admitted without first holding an evidentiary hearing. *See, e.g., Hill*, 818 F.3d at 298; *Jones*, 918 F. Supp. 2d at 4-5; *Fountain*, 62 N.E.3d at 1124-25; *Commonwealth v. Nevels*, 203 A.3d 229, 241 (Pa. Super. Ct. 2019). In so doing, however, these courts have distinguished the use of historic cell site data to determine the general location of a phone from the theory of "granulization," which purports to identify a caller's specific location. *See United States v. Evans*, 892 F. Supp. 2d 949, 956-57 (N.D. Ill. 2012).

¶ 33    The theory of "granulization" was rejected by the United States District Court for the Northern District of Illinois in *Evans*, on which Shanks heavily relies. Although *Evans* does not define "granulization," the court explained that the theory requires an expert to identify

(1) the physical location of the cell sites used by the phone during the relevant time period; (2) the specific antenna used at each cell site; and (3) the direction of the antenna's coverage. He then estimates the range of each antenna's coverage based on the proximity of the tower to other towers in the area. This is the area in which the cell phone could connect with the tower given the angle of the antenna and the strength of its signal. Finally, using his training and experience, [the expert] predicts where the coverage area of one tower will overlap with the coverage area of another.

*Id.* at 952. Using this theory, the prosecution in *Evans* sought to prove that the defendant was in the same building where the kidnapping victim was held for ransom because the building fell squarely within the coverage overlap of two towers used by the defendant's phone to make calls during a relevant time period. *Id.*

¶ 34    The court identified two flaws with the theory of granulization: (1) it assumes that a cell phone uses the tower closest to it at the time of a call, without accounting for the possibility that the phone might have connected to other towers based on a variety of factors; and (2) it remains wholly untested by the scientific community. *Id.* at 956. Although the court acknowledged that certain types of historical cell site analysis are reliable and admissible, it rejected

the use of granulization theory to pinpoint the defendant's location. *Id.* at 953, 955, 957.

¶ 35    Having considered the foregoing cases, we hold that the use of historical cell site data to determine the general geographic location of a cell phone is widely accepted as reliable and does not require a *Shreck* hearing.  Accordingly, we conclude the district court did not abuse its discretion by denying Shanks's request for a *Shreck* hearing.

¶ 36    We further conclude that the evidence presented at trial was within the bounds of reliable historical cell site analysis.  The prosecution experts generally explained how cell towers work and identified the variables and limitations incorporated into their analyses.  Ms. Battan mapped the cell towers, identified which of Shanks's calls used which towers and sectors, and opined — when asked on cross-examination — that it was not possible for Shanks's phone to be eighteen miles away from a tower to which it connected.

¶ 37    Agent Eicher testified that he had reviewed Ms. Battan's analysis and agreed with it.  He further opined, based on the approximate coverage area of cell towers in the Denver metro area,

that it was not feasible for Shanks's phone to be eighteen miles away at the time of the offense.

¶ 38     Importantly, neither expert opined about coverage overlap between towers or that a cell phone necessarily connects to the closest tower.  Neither expert opined as to the precise location of Shanks's phone at any specific time.

¶ 39     Shanks takes issue with how Ms. Battan portrayed the cell tower sectors on her map and how Agent Eicher estimated the range of cell towers in the Denver metro area.  Shanks also argues that the prosecution experts failed to consider the many variables affecting how a cell phone and tower connect.

¶ 40     But to the extent either expert's opinion was based on assumptions about coverage range or fails to account for certain variables, any challenges to those assumptions or to the expert's application of variables went to the weight of the evidence, not its admissibility.  *See Jones*, 918 F. Supp. 2d at 5 ("[T]o the extent that Agent Eicher's testimony relies on assumptions about the strength of the signal from a given cell tower, any challenges to those assumptions go to the weight of his testimony, not its reliability.").  Indeed, while assumptions and variables may be tested by vigorous

cross-examination, they do "not render the fundamental methodology of cell site analysis unreliable." *Id.*; *see also United States v. Pembrook*, 119 F. Supp. 3d 577, 597-98 (E.D. Mich. 2015) ("[T]o the extent that [the witness] has made assumptions about signal strength that call into question his estimate of where the phones were located at particular times, Defendants can test those assumptions on cross exam.").

¶ 41      Here, both prosecution experts were subject to thorough cross-examination.  Shanks also offered his own expert to challenge the accuracy of the prosecution's evidence.  That the experts disagreed did not undermine the reliability of the evidence or counsel against its admission in the first place.  *See Campbell*, ¶ 42.

¶ 42      Thus, we also conclude that the district court did not abuse its discretion by admitting Ms. Battan's and Agent Eicher's testimony.

### III.   Identification Evidence

¶ 43      Shanks contends that the district court erred by denying his motion to suppress the victim's out-of-court identification. According to Shanks, the court further erred by admitting the victim's in-court identification, which was based on the

impermissibly suggestive out-of-court identification.  We disagree with both contentions.

## A.    Standard of Review

¶ 44    "The ultimate question as to the constitutionality of pretrial identification procedures is a mixed question of law and fact." *Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002).  Thus, "[w]hen reviewing a trial court's denial of a motion to suppress, we generally defer to the trial court's factual findings, but review its legal conclusions de novo."  *People v. Plancarte*, 232 P.3d 186, 189 (Colo. App. 2009).  But while the trial court's findings of historical fact are entitled to deference, "an appellate court may give different weight to those facts and may reach a different conclusion in light of the legal standard."  *Bernal*, 44 P.3d at 190; see *People v. Singley*, 2015 COA 78M, ¶ 9.

## B.    Applicable Law

¶ 45    To determine the admissibility of an out-of-court photographic identification, the court must engage in a two-step analysis.  First, the defendant must prove that the identification procedure was impermissibly suggestive.  *Bernal*, 44 P.3d at 191; *Singley*, ¶ 14.  If the defendant fails to meet this initial burden, no further inquiry is

required and the identification is admissible. *Bernal*, 44 P.3d at 191 ("It is important to note that these two steps must be completed separately; it is only necessary to reach the second step if the court first determines that the array was impermissibly suggestive."); *Singley*, ¶ 14.

¶ 46    Second, if the court finds the photo array impermissibly suggestive, the burden shifts to the prosecution to show that the identification was nonetheless reliable under the totality of the circumstances. *Bernal*, 44 P.3d at 192; *see also Singley*, ¶ 15. "As long as the totality of the circumstances does not indicate a very substantial likelihood of irreparable misidentification, no constitutional impediment to the admission of the identification testimony exists." *Bernal*, 44 P.3d at 192.

¶ 47    But a "defendant is denied due process when an in-court identification is based upon an out-of-court identification which is so suggestive as to render the in-court identification unreliable." *People v. Borghesi*, 66 P.3d 93, 103 (Colo. 2003).

¶ 48    In determining whether the pretrial photo identification procedure is impermissibly suggestive, the court may consider such relevant factors as "the size of the array, the manner of its

presentation by the officers, and the details of the photographs themselves." *Bernal*, 44 P.3d at 191. The size of the array is a factor affecting the weight a court gives to any irregularities. *Id.* Thus, the more pictures used, the less likely it is that a minor difference will have a prejudicial effect; the fewer pictures used, the closer the array must be scrutinized. *Id.*

¶ 49 The crucial question when examining the array itself is "whether the picture of the accused, which matches descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that that person was more likely to be the culprit.'" *Id.* (quoting *Jarerett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). "In other words, the array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *Id.* The array need not include exact replicas of the defendant or be uniform with respect to a given characteristic, but they must be "matched by race, approximate age, facial hair, and a number of other characteristics." *Id.* at 191-92 (quoting *People v. Webster*, 987 P.2d 836, 839 (Colo. App. 1998)). An array that includes a photo "unique in a manner directly related to an important identification factor" may be impermissibly

25

suggestive.  *Id.* at 192; *see also Grubbs v. Hannigan,* 982 F.2d 1483, 1490 (10th Cir. 1993) ("Although a photo-lineup is not necessarily suggestive merely because the individuals in the lineup differ in facial characteristics, . . . here the differences were either strikingly apparent, such as a swollen eye, or they related to an important component of [the victim's] description of her assailant, his hair style.").

¶ 50    We are in the same position as the district court to review the details of the photographs and consider their placement in the array.  Thus, we review de novo whether the photographic array itself was impermissibly suggestive.  *See People v. Carlos*, 41 Cal. Rptr. 3d 873, 876 (Cal. Ct. App. 2006) (reviewing the suggestibility of a photo array de novo); *McCoy v. United States*, 781 A.2d 765, 771 (D.C. 2001) (same); *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009) ("We review *de novo* a trial court's ruling on how the suggestiveness of a pre-trial photo array may have influenced an in-court identification."); *cf. People v. Ramadon*, 2013 CO 68, ¶ 21 ("When the interrogation is audio or video-recorded, and there are no disputed facts outside the recording pertinent to the suppression issue, we are in the same position as

the trial court in determining whether the statements should or should not be suppressed under the totality of the circumstances.").

## C.    Analysis

¶ 51    The victim described the second assailant as a "black Abe Lincoln" because he had "an Abe Lincoln style beard on his chin and high cheek bones." The photo array presented to him contained pictures of six men arranged in two rows of three, with Shanks appearing in the middle of the bottom row. The men all appear to be African-American, though one man (not Shanks) has noticeably lighter skin than the other five. They all have similarly placed cheekbones, close-shaven haircuts, and some facial hair.[3] They all appear to be of similar age. Officers presented the array in black-and-white, so there is no drastic difference in background color, lighting, or clothing color. All men appear to be wearing prison clothing. Each photograph is only of the head and neck and reveals nothing of the height or weight of the men.

---

[3] None of the men have particularly bushy sideburns or beards, which typically are associated with Abraham Lincoln. However, at trial, the victim testified that he used the description "black Abraham Lincoln" in reference to the $5 bill, which depicts Lincoln with closely-trimmed facial hair. In any event, Shanks's facial hair does not distinguish him from the others in the photo array.

¶ 52 Shanks points out that he is the only one with a pointy head, that he has small ears, and that his nose is broader than the rest. We agree that none of the other men have heads as pointy as Shanks's or a nose that is quite as broad; however, several of the men do have long, slender faces and small ears, and their noses are a range of sizes. Further, the victim did not describe his assailant as having a pointy head, small ears, or a broad nose, so these are not defining characteristics that create impermissible suggestiveness. *See Borghesi*, 66 P.3d at 105; *Bernal*, 44 P.3d at 192; *People v. Owens*, 97 P.3d 227, 233 (Colo. App. 2004).

¶ 53 Thus, we conclude that the photo array itself was not impermissibly suggestive and that the district court did not abuse its discretion by admitting it. Because we have concluded that the photo array was not impermissibly suggestive, we need not determine whether the identification was otherwise reliable under the totality of the circumstances.

¶ 54 Further, we conclude that the victim's subsequent in-court identification of Shanks was not inherently unreliable. As noted, the in-court identification was not preceded by an impermissibly suggestive pretrial identification procedure, and there was nothing

28

suggestive about the in-court identification beyond the normal courtroom setting. *See Garner v. People*, 2019 CO 19, ¶ 5. Defense counsel was able to cross-examine the victim about the identification during the trial and to highlight for the jury any factors he believed made the in-court identification suggestive. *See id.* at ¶ 55. Thus, we also conclude that the district court did not err by admitting the in-court identification.

## IV. Alternate Suspect Defense

¶ 55 Shanks contends that the district court violated his rights to due process, to present a defense, and to a fair trial by denying his alternate suspect defense. We disagree.

## A. Standard of Review

¶ 56 We review the trial court's evidentiary decisions, including whether to admit alternate suspect evidence, for an abuse of discretion. *People v. Folsom*, 2017 COA 146M, ¶ 29. A trial court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair, or "is based on an erroneous view of the law." *People v. Elmarr*, 2015 CO 53, ¶ 20.

## B.   Applicable Legal Principles

¶ 57    A defendant has a constitutional right to present a defense, including the right to present evidence that someone other than the defendant may have committed the crime, because "a criminal defendant is entitled to all reasonable opportunities to present evidence that might tend to create doubt as to [his] guilt." *Folsom,* ¶ 30 (quoting *Elmarr,* ¶ 26).  To be admissible, however, the alternate suspect evidence must be relevant and its probative value must not be substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403; *see Elmarr,* ¶ 27. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401.

¶ 58    "[T]he admissibility of alternate suspect evidence ultimately depends on the strength of the connection between the alternate suspect and the charged crime."  *Elmarr,* ¶ 22; *accord Folsom,* ¶ 31.  The "evidence must create more than just an

unsupported inference or possible ground for suspicion." *Elmarr*, ¶ 32. Instead, the evidence must establish a "non-speculative connection or nexus between the alternate suspect and the crime charged." *Id.* Whether the requisite connection exists requires a case-by-case analysis considering all evidence proffered by the defendant to show that the alternate suspect committed the crime. *Id.*

¶ 59    The Colorado Supreme Court has held on numerous occasions that merely showing that an alternate suspect had the motive or the opportunity to commit the charged offense, without some additional proof connecting the alternate suspect to the offense, is insufficient to prove that necessary nexus. *E.g., id.* at ¶ 34 ("[E]vidence merely showing that someone else had a motive or opportunity to commit the charged crime — without other additional evidence circumstantially or inferentially linking the alternate suspect to the charged crime — presents too tenuous and speculative a connection to be relevant because it gives rise to no more than grounds for possible suspicion."); *People v. Mulligan*, 193 Colo. 509, 518, 568 P.2d 449, 456-57 (1977) (same).

## C.    Additional Background

¶ 60    Before trial, Shanks endorsed an alternate suspect defense, asserting that a man named Andrew Davis was the second assailant.  Shanks's endorsement stated the following:

- Davis and Eastman were "associated" at the time of the offense;

- Davis was at liberty and lived in the area of the offense at the time and therefore had the opportunity to commit it;

- Eastman did not approve of Shanks's relationship with her mother and the two had never gotten along;

- Davis was associated with a gray Volkswagon Jetta and a witness described the car that dropped Cody off just after the offense as a gray Jetta;

- Davis's physical appearance more closely resembled the description given by the victim; and

- Davis had an extensive criminal history involving menacing, weapons, and home invasions.

¶ 61    The prosecution moved to strike the endorsement and preclude Shanks from presenting alternate suspect evidence at

trial, arguing that the facts alleged were speculative and irrelevant to the charged offense. The court granted the prosecution's motion.

¶ 62 At the beginning of trial, after it had become clear that Eastman would testify, defense counsel again asked for permission to introduce alternate suspect evidence. Counsel represented to the district court that Eastman had recently told her mother that Davis committed the crime with her and Cody, not Shanks.

¶ 63 The district court still found that the proffered evidence was not alternate suspect evidence and that there was "no actual connection" between Davis and the charged offense. The court did conclude, however, that the evidence could be used for impeachment, depending on Eastman's testimony at trial. The court said that defense counsel could question Eastman about her relationship with Davis, about her covering up for him and lying to investigators, and about her dislike of Shanks. In addition, counsel likely would be allowed to introduce the photographs of Davis.

¶ 64 At trial, Eastman denied telling her mother that Davis helped commit the offense. She also testified that she was not dating Davis at the time. Her mother testified to the contrary and was shown pictures of Davis, which she confirmed accurately reflected his

appearance at that time. For reasons not pertinent to our analysis, no photographs of Davis were admitted at trial. Still, the court told defense counsel that he could argue in closing that Davis was an alternate suspect. Ultimately, counsel did not do so.

### D. Analysis

#### 1. The District Court Did Not Abuse Its Discretion

¶ 65 The evidence Shanks first presented to the district court in support of his endorsement of an alternate suspect, even considered collectively, was speculative and did not provide a direct nexus between Davis and the offense. Generally, it demonstrated that Davis lived nearby at the time and was potentially dating one of the codefendants, thereby providing him the opportunity to commit the offense. But no one identified Davis as being involved in the offense, there was no physical evidence linking him to the offense, there was no evidence of a motive for him to commit the offense, there was no evidence about factual similarities between this offense and his previous crimes, and the victim confidently identified Shanks as the assailant. *See Elmarr*, ¶ 30 ("A defendant . . . suggesting that an alternate suspect committed the crime . . . might seek to show that someone else: had a motive to commit the

crime; had an opportunity to commit the crime; confessed to the crime or otherwise engaged in behavior indicating his involvement; is linked to physical evidence of the crime; or committed similar acts or crimes."); *Owens*, 97 P.3d at 235 (affirming trial court's exclusion of evidence that raised speculation but provided no "direct connection" between the alternate suspect and the crime); *People v. Perez*, 972 P.2d 1072, 1074-75 (Colo. App. 1998) (rejecting alternate suspect evidence based on commission of a similar crime when the evidence did not "indicat[e] any distinctive similarities in the details of the crimes"); *cf. Folsom*, ¶¶ 38-40 (reversing trial court's exclusion of evidence that an alternate suspect, among other things, had been convicted of a similar crime in the same geographic area; had been linked to numerous other incidents in the area in the same general timeframe, including at least three incidents at the victim's house; was identified by the victim as a person she recognized; and more closely matched the victim's description than did the defendant).

¶ 66    And although Shanks told the district court on the morning of trial that Eastman would provide a direct link between Davis and the crime, Eastman actually testified that Davis was not involved

and denied that she had ever told her mother that Davis was involved. Thus, the evidence created nothing more than "an unsupported inference or possible ground for suspicion" that Davis committed the charged crimes. Under these circumstances, the district court did not abuse its discretion.

### 2. Any Error by the District Court Was Harmless

¶ 67 Even if we were to assume the district court erred by precluding certain alternate suspect evidence, we conclude that any such error was harmless. An evidentiary error precluding a defendant from presenting evidence may be of constitutional magnitude "only where the defendant was denied virtually his [or her] only means of effectively testing significant prosecution evidence." *People v. Brown*, 2014 COA 155M-2, ¶ 6 (quoting *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009)). Otherwise, reversal is required only if the error "substantially influenced the verdict or affected the fairness of the trial." *Brown*, ¶ 6; *see also Elmarr*, ¶ 27 ("[T]he right to present a defense is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence.").

¶ 68    Here, the district court did not preclude defense counsel from mentioning Davis or arguing his theory of defense that this was a case of mistaken identity. Defense counsel was still permitted to, and in fact did, attack Eastman's credibility by questioning her and her mother about Davis's involvement with Eastman and Eastman's alleged statements to her mother that Davis was the second assailant. Thus, despite not receiving a jury instruction on alternate suspect evidence, the jury had before it sufficient evidence and argument to understand Shanks's defense.

¶ 69    Accordingly, even if the district court erred in denying Shanks his alternate suspect defense, the error was harmless.

## V.    Use of Nickname

¶ 70    Shanks contends the district court erred by admitting references to his nickname, "Capone," which created unfair prejudice because the name is a "gang name." We disagree.

### A.    Preservation and Standard of Review

¶ 71    The parties disagree as to whether this claim of error was preserved and what standard of review should apply. Shanks contends it was preserved by defense counsel's objection to the prosecutor's use of "Capone" as his "moniker" or "alias." As the

transcript reveals, defense counsel suggested that the prosecutor use the word "nickname" instead of "moniker" or "alias," the prosecutor revised his question accordingly, and the district court never ruled on the objection. Defense counsel did not otherwise object to the use of the nickname "Capone" throughout the balance of the trial.

¶ 72 We review a trial court's decision to admit evidence for an abuse of discretion. *People v. Clark*, 2015 COA 44, ¶ 14. If the alleged evidentiary error is unpreserved, we reverse only if the error was plain. *Hagos v. People*, 2012 CO 63, ¶ 14. Plain errors are those that are obvious and substantial and so undermine the fundamental fairness of the trial itself as to cast serious doubt on the judgment of conviction. *Id.* Because we find the district court did not abuse its discretion, we need not resolve the parties' dispute regarding preservation.

B.    Analysis

¶ 73 "[B]ecause 'gangs are regarded with considerable disfavor by our society,' gang-related evidence must be 'admitted with care.'" *Clark*, ¶ 16 (quoting *People v. Trujillo*, 2014 COA 72, ¶ 72). Here, however, no evidence was presented that Shanks was in a gang,

that his nickname was affiliated with a gang, or that this offense was gang-related. Indeed, the word "gang" was not used once in front of the jury during trial. The only reason the nickname was used was because that is the name by which most of the witnesses knew Shanks. In fact, some of the witnesses did not even know his real name. And the prosecutor did not use the name as a way of introducing bad character evidence. It was used merely for identification, and to argue that the jury should discount good character testimony from Shanks's family members because they did not even know he was nicknamed "Capone."

¶ 74    Under these circumstances, we perceive no abuse of discretion in the district court's decision to allow the use of the nickname. *See People v. Samuels*, 228 P.3d 229, 243 (Colo. App. 2009).

## VI.    Cumulative Error

¶ 75    Lastly, Shanks contends that the cumulative effect of the errors raised in this appeal warrant reversal. We disagree.

¶ 76    "We will reverse for cumulative error where, although numerous individual allegations of error may be deemed harmless and not require reversal, in the aggregate those errors show prejudice to the defendant's substantial rights and, thus, the

absence of a fair trial." *People v. Stewart*, 2017 COA 99, ¶ 39

(quoting *People v. Gallegos*, 260 P.3d 15, 28-29 (Colo. App. 2010));

*see People v. Mendenhall*, 2015 COA 107M, ¶ 82.  However, for the

doctrine to apply, numerous errors must have been committed, not

merely alleged.  *People v. Allgier*, 2018 COA 122, ¶ 70.

¶ 77    Having found no errors, we reject this contention.

## VII.   Conclusion

¶ 78    The judgment is affirmed.

JUDGE FURMAN and JUDGE DAVIDSON concur.