23CA0625 Peo v Miller 04-10-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0625
City and County of Denver District Court No. 11CR5114
Honorable Jennifer B. Torrington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ryan J. Miller,

Defendant-Appellant.

ORDER AFFIRMED

Division VII
Opinion by JUDGE MOULTRIE
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Reppucci Law Firm, P.C., Jonathan D. Reppucci, Denver, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Ryan J. Miller, appeals the court's denial of his Crim. P. 35(c) motion without a hearing.  We affirm.

I.    Background and Procedural History

¶ 2    The historical facts giving rise to this case are set forth in *People v. Miller*, (Colo. App. No. 13CA1371, Sept. 21, 2017) (not published pursuant to C.A.R. 35(e)) (*Miller I*) and *People v. Miller*, (Colo. App. No. 19CA1456, Aug. 5, 2021) (not published pursuant to C.A.R. 35(e)) (*Miller II*).  As recited in *Miller II*:

> In brief, the People charged both Miller and his friend [Richard Leavitt] with, among other things, murdering [the victim], Miller's ex-girlfriend.  [Leavitt] agreed to testify against Miller at trial in exchange for pleading guilty to a reduced charge of second degree murder.  [Leavitt] testified that Miller had admitted shooting and killing [the victim.]  The People also presented other evidence linking Miller to [the victim's] murder; for example, Miller had previously forced his way into [the victim's] apartment and assaulted her after she broke up with him and he became bitter and obsessed about the breakup, and Miller's DNA was on the murder weapon (a handgun). Miller's defense was that [Leavitt] murdered [the victim], and he wasn't involved at all.

*Miller II*, ¶ 2.

¶ 3    A jury convicted Miller of first degree murder, second degree kidnapping, first degree burglary, first degree criminal trespass, and

1

third degree assault.  A division of this court affirmed Miller's convictions.  *Miller I*, ¶ 66.

¶ 4    In 2017, Miller filed a pro se Crim P. 35(c) motion for postconviction relief, asserting that his trial and appellate counsel were ineffective.  The postconviction court summarily denied Miller's motion without a hearing.  Miller appealed the postconviction court's ruling, and a division of this court affirmed.  *Miller II*, ¶ 59.

¶ 5    In 2022, Miller, through counsel, filed the Crim P. 35(c) motion for postconviction relief (the 2022 motion) at issue in this appeal.  Miller asserted two claims based on newly discovered evidence arising from (1) Leavitt's alleged confession to a cellmate and (2) alleged "new technology, scientific advances, and professional and/or academic consensus" related to the analysis and mapping of cell phone records.  Miller also asserted two claims based on constitutional error.  He requested an evidentiary hearing on the 2022 motion and an order reversing his judgment of conviction and granting him a new trial.  The postconviction court issued a thorough written order denying the 2022 motion without holding an evidentiary hearing.

¶ 6     On appeal, Miller contends that the postconviction court erred by summarily denying the 2022 motion.[1]

## II.     Standard of Review

¶ 7     We review de novo a postconviction court's decision to summarily deny a Crim. P. 35(c) motion. *People v. Cali*, 2020 CO 20, ¶ 14.  In a Crim. P. 35(c) proceeding, we presume the validity of the convictions, and the defendant bears the burden of proving that he is entitled to postconviction relief. *Dunlap v. People*, 173 P.3d 1054, 1061 (Colo. 2007).  A court "may deny a Crim. P. 35(c) motion without a hearing if the allegations are bare and conclusory; the allegations, even if true, do not warrant relief; or the record refutes the claims." *People v. Joslin*, 2018 COA 24, ¶ 4; Crim. P. 35(c)(3)(IV).

## III.     Newly Discovered Evidence

¶ 8     Miller contends that he was entitled to a hearing on the 2022 motion because his two claims of newly discovered evidence had

---

[1] Miller didn't challenge his convictions for kidnapping, burglary, assault, and trespass in the 2022 motion.  Accordingly, we review only his challenge to his first degree murder conviction. *See People v. Goldman*, 923 P.2d 374, 375 (Colo. App. 1996) ("Allegations not raised in a Crim. P. 35(c) motion . . . and thus not ruled on by the trial court are not properly before this court for review.").

arguable merit and asserted facts that, if true, would entitle him to relief. We address and reject each of his claims of newly discovered evidence.

### A. Applicable Law

¶ 9 To succeed on a motion for a new trial based on newly discovered evidence, a defendant must satisfy the factors identified in *People v. Muniz*, 928 P.2d 1352, 1357 (Colo. App. 1996) (the *Muniz* elements):

> the evidence was discovered after trial; that defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; that the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and lastly, that the newly discovered evidence is of such character as probably to bring about an acquittal verdict if presented at another trial.

*See Farrar v. People*, 208 P.3d 702, 706-07 (Colo. 2009); *see also People v. Genrich*, 2019 COA 132M, ¶ 41.

### B. Leavitt's Alleged Confession

¶ 10 Miller first contends that the postconviction court erred by denying him the opportunity to present at an evidentiary hearing

newly discovered evidence of Leavitt's alleged confession to a third party. We disagree.

### 1. Additional Facts

¶ 11 At trial, Leavitt testified that Miller planned the victim's murder and fatally shot her. Miller asserted in the 2022 motion that, after his conviction, Leavitt told a fellow inmate that Leavitt was in custody because of his marijuana business; an unidentified person "owed him some money and they got killed, and [Leavitt] got 48 years in prison and his partner got life"; and Leavitt's partner was lucky that "he did not get what she got too." When asked about the word "she," Leavitt told the inmate, "well I owe a lot of money and there are debts that we take in" and "I wound up taking 48 years while he got life, he's lucky I did not kill him too." Leavitt continued, "she owed the money, and I was going to knock off both of them"; through his plea deal, Leavitt "got 48 years and lucked out on that"; and "that fool is lucky I did not off him too, he got life."

¶ 12 The postconviction court rejected Miller's claim, concluding that, while the 2022 motion satisfied the first two *Muniz* elements, it failed to satisfy the third and fourth elements because the evidence was "merely cumulative or impeaching" and Leavitt's statements

5

were "not of such character as to probably bring about an acquittal if presented at another trial."

## 2. Application

¶ 13     We agree with the postconviction court that Miller failed to allege facts that, even accepted as true, were sufficient to satisfy the third and fourth *Muniz* elements. *See Genrich,* ¶ 41.

¶ 14     As the postconviction court noted, with respect to the first two *Muniz* elements, it's undisputed that Leavitt's alleged statements were made after trial and that due diligence by Miller or his counsel therefore wouldn't have revealed the evidence before the end of trial.

¶ 15     With respect to the third *Muniz* element, we conclude that Miller failed to show that the newly discovered evidence "is material to the issues involved, and not merely cumulative or impeaching." *Id.* At most, Leavitt's statements, even if true, merely impeach his trial testimony that Miller planned the victim's murder and fatally shot her — it doesn't necessarily demonstrate Miller's innocence. *See Farrar,* 208 P.3d at 707 (to be sufficiently material, new evidence must be "consequential in the sense of being affirmatively probative of the defendant's innocence").

¶ 16    Leavitt's alleged statements aren't material because they don't contain "sufficiently significant new evidence" that "will probably be believed" over his trial testimony.  *See id.* at 707-08.  Instead, Miller asks us to (1) speculate that Leavitt's statements relate to this case and the victim, even though neither Miller nor the victim is identified by name in the statements, and (2) interpret Leavitt's statements to mean that Leavitt — not Miller — shot the victim.  Without more context to or evidence supporting Leavitt's statements, we decline to do so.  *See People v. Bossert*, 772 P.2d 618, 621 (Colo. 1989) (stating that, to prove that testimony was perjured, a defendant must show that the declarant made a materially false statement); *see also Farrar*, 208 P.3d at 708 (noting that a witness's recantation necessarily serves to impeach their credibility and therefore "it can justify a new trial only to the extent that it not only impeaches the prior testimony but does so by contradicting it with a different and more credible account").  And as the postconviction court noted, Miller presented no evidence or defense at trial concerning his and Leavitt's involvement in an illegal marijuana business, such that Leavitt might have had a

motive to kill the victim or indicating that Leavitt was specifically referring to Miller and Miller's girlfriend.

¶ 17    Moreover, even if evidence of Leavitt's alleged recantation satisfied the materiality prong of *Muniz*, we would affirm the postconviction court's order because "the newly discovered evidence is [not] of such character as probably to bring about an acquittal if presented at another trial." *Genrich*, ¶ 41. As the *Miller I* division noted, the prosecution presented "ample evidence from which the jury could have concluded that [Miller] had . . . a motive" to kill the victim, and — even if Leavitt shot and killed the victim — the prosecution presented sufficient evidence for the jury to find Miller guilty under a complicity theory of liability. *See* § 18-1-603, C.R.S. 2024 (a defendant is liable under a complicity theory of liability for a criminal offense committed by another if, "with the intent to promote or facilitate the commission of the offense, [he] aids, abets, advises, or encourages the other person in planning or committing the offense"). Considering the vagueness of Leavitt's statements and the ample evidence that Miller participated in planning the victim's murder and killed her, as detailed in the postconviction

8

court's order, Miller has not alleged facts sufficient to show that the new evidence would likely lead to his acquittal.

## C.    Cell Phone Science

¶ 18    Miller also contends that the postconviction court erred by denying him an evidentiary hearing to present newly discovered evidence related to the reliability of the prosecution's cell phone expert's methods.  We disagree.

### 1.    Additional Facts

¶ 19    Before trial, Miller objected to the proposed testimony of the prosecution's cell phone expert, Detective Alfonso Cervera, and moved for an evidentiary hearing under *People v. Shreck*, 22 P.3d 68 (Colo. 2001), which the trial court denied.

¶ 20    At trial, the court admitted into evidence the "call detail" records from Miller's and Leavitt's respective cell phones and qualified Detective Cervera as an expert in cell site analysis and call record detail over Miller's objection.  Detective Cervera described "call detail" records as a phone's billing records, which include information about the dates and times that a phone was used, as well as information about what cell site or antenna the phone used during a specified period of the phone's usage.  Detective Cervera

testified that he examined historical data from the call detail records to determine whether Miller's and Leavitt's cell phones were near specific locations — the crime scene and other locations of interest — on the day the victim was murdered.  Detective Cervera prepared a "slide show" to display some of the cell phone data.

¶ 21     Using that slide show, he explained that each cell phone antenna site covers approximately a half mile to one mile in an urban area. Detective Cervera also explained that, while a phone's exact location could not be determined from the data, the data generally represented where a phone was located in the cell site area during the phone's call, text, or internet activity.  He said that his opinion about where a particular phone was located in relation to particular antennae was "an estimate based on training and experience" and was "very conservative."  Detective Cervera concluded that the cell site location data were consistent with Miller's and Leavitt's phones being near the crime scene around the time of the victim's murder.

¶ 22     On cross-examination, and as noted in *Miller II*,

> Detective Cervera testified that tracking cell phone call activity isn't an exact science, all activity data doesn't reveal the length of a call

or a person's direction of travel during a call; various environmental factors, including the distance between the cell towers facilitating signal reception, affect a call's indicated location; and ultimately cell phone activity data provides only an approximate location of someone using a cell phone.

*Miller II*, ¶ 44.

¶ 23 In the 2022 motion, Miller argued that newly discovered evidence in the form of derivative mapping based on "new scientific developments" and "previously unavailable technology," coupled with current professional or academic consensus regarding "the use of call detail records analysis to pinpoint a device's location," would prove that Detective Cervera's testimony was unsupported, unreliable, and misleading. Miller specifically challenged the way Detective Cervera drew pie-shaped wedges on his mapping to depict cell site coverage ranges of over one and a half miles. He also asserted that the locations of Miller's phone could not be determined without a "drive test" of the cell tower coverage area. Miller thus argued that it was "impossible to determine with any reasonable degree of certainty" that his cell phone was at or near the location of the victim's murder. In denying Miller's motion, the postconviction court determined that Miller had not established any

11

of the four *Muniz* elements such that a hearing on newly discovered cell phone science was warranted.

## 2.     Analysis

¶ 24     Accepting as true Miller's assertion that, since his trial, there have been technological or scientific advances pertaining to the analysis and mapping of cell phone records, and that Miller and his counsel acted with the necessary reasonable diligence in discovering this new information, we conclude that Miller wasn't entitled to a hearing because he failed to establish the third and fourth *Muniz* elements.

¶ 25     As to the third *Muniz* element, Miller has failed to show that the newly discovered evidence is material. *Genrich*, ¶ 41. The jury received substantial evidence from other witnesses about Miller's actions on the day of the victim's murder, independent of Detective Cervera's testimony that Miller's cell phone records placed Miller near the crime scene. Detective Cervera repeatedly acknowledged that his mapping was an estimate of cell site coverage and Miller's phone may have been located inside or outside of the areas he identified, and on cross-examination, Miller's counsel thoroughly questioned the reliability of Detective Cervera's methods and

mapping. Thus, Miller fails to explain how his purported new evidence calls into doubt the previously presented evidence indicating that determining a cell phone's location from cell cite data is an imprecise science at best.

¶ 26 Moreover, Miller makes the conclusory allegation that Detective Cervera's methods were "scientifically baseless, absent drive testing." But "drive testing" — a different method used to determine the approximate, but not exact, location of a cell phone — is based on the same principles underlying the historic cell site analysis to which Detective Cervera testified. *See United States v. Morgan*, 45 F.4th 192, 203-04 (D.C. Cir. 2022). And Detective Cervera used historical cell site analysis, which a division of this court has held to be "widely accepted as reliable" when used "to determine the general geographic location of a cell phone." *People v. Shanks*, 2019 COA 160, ¶ 35. Accordingly, Miller's alleged new evidence is cumulative.

¶ 27 We also conclude that, because ample other evidence supported his conviction, Miller has failed to establish that the newly discovered evidence would probably lead to his acquittal, as the fourth *Muniz* element requires. *See People v. Tomey*, 969 P.2d

13

785, 787 (Colo. App. 1998) (noting that, in determining whether newly discovered evidence would likely lead to an acquittal, a court should consider the newly discovered evidence along with all other evidence likely to be presented at a new trial).

¶ 28    As the postconviction court noted, substantial evidence supported Miller's conviction independent of the cell phone evidence, including detection of gunshot residue on sweatpants linked to Miller through DNA and witness testimony; congruent markings on a bullet recovered from the victim's skull and a bullet "test fired" from a gun that Miller had in his possession when he was arrested; and multiple witnesses' testimony regarding Miller's erratic behavior and hysterical demeanor the day of the victim's murder.  Therefore, we discern no error in the postconviction court's determination that Miller was not entitled to a hearing based on newly discovered cell phone science evidence.

## IV.    Constitutional Error

¶ 29    Miller argues the postconviction court further erred by summarily denying the 2022 motion because it included an allegation that the trial court violated his constitutional rights to

due process and a fair trial by permitting the prosecution to introduce the cell phone evidence.  We disagree.

¶ 30    As a preliminary matter, the People contend that this claim should be denied as successive.  We reject this argument because Miller's claim is based upon alleged new evidence that could not have been previously discovered through due diligence and an asserted new rule of constitutional law.  Crim. P. 35(c)(3)(VI)(a)-(b).  With respect to the latter argument, Miller cites the special concurrence in *Genrich* for the proposition that he was entitled to an evidentiary hearing based on his due process claim.  *Genrich*, ¶¶ 134-36 (Berger, J., specially concurring).  However, the majority opinion in *Genrich* didn't address whether the trial court deprived the defendant of due process by denying his Crim. P. 35(c) motion without a hearing.  *Id.* at ¶ 69.  Miller doesn't cite any other Colorado law to support his contention.

¶ 31    In any event, we are bound by *Farrar*, in which the supreme court held that "claims of newly discovered evidence do not draw into question the constitutionality of a criminal conviction."  208 P.3d at 706.  And the supreme court "has never suggested that newly discovered evidence impeaching a guilty verdict implicates

15

due process of law." *Id.* Miller's citations to opinions from other jurisdictions do not persuade us otherwise. *See People v. Denhartog,* 2019 COA 23, ¶ 78 ("[T]he supreme court 'alone can overrule [its] prior precedents concerning matters of state law.'") (quoting *People v. Novotny,* 2014 CO 18, ¶ 26).

¶ 32　　Accordingly, we conclude the postconviction court properly denied Miller's asserted constitutional due process claim premised on the cell phone evidence.

## V.　Complicity Theory Jury Instruction

¶ 33　　Miller also contends the trial court denied his constitutional right to due process and a fair trial by instructing the jury on complicity as a theory of liability because the prosecution didn't charge him with complicity. We decline to address this contention because it is successive.

## A.　Additional Facts

¶ 34　　At trial, at the prosecution's request, the court instructed the jury on complicity as a theory of liability. Miller objected on the basis that complicity was not a charged offense, and the evidence could not support a guilty verdict on that charge.

¶ 35    In the 2022 motion, Miller asserted that he was deprived of due process and fair notice of the charges against him when the trial court submitted the prosecution's complicity theory to the jury. Citing *Grissom v. People*, 115 P.3d 1280, 1283 (Colo. 2005), the postconviction court noted that complicity is not a distinct crime but rather a theory "by which a defendant becomes accountable for a criminal offense committed by another."  The postconviction court also noted that, in *People v. Jimenez*, 217 P.3d 841, 871 (Colo. App. 2008), a division of this court held that allowing a jury to consider a defendant's culpability under a complicity theory did not violate the defendant's due process rights.  Thus, the postconviction court found Miller's claim "unavailing" because the jury instruction complied with existing legal standards and because his conviction was affirmed in *Miller I.*

## B.    Applicable Law

¶ 36    Rule 35(c) allows a defendant to challenge a judgment of conviction on the grounds that it was obtained in violation of his constitutional or statutory rights.  *See* Crim. P. 35(c)(2)(I).  But unless an enumerated exception applies, a postconviction court "must deny any Crim. P. 35(c) claim that was raised and resolved,

17

or that could have been raised, in a prior appeal or postconviction proceeding." *People v. Higgins*, 2017 COA 57, ¶ 18; Crim. P. 35(c)(3)(VI), (VII).

## C.    Analysis

¶ 37    Miller characterizes his claim of instructional error as a constitutional challenge cognizable under Crim P. 35(c)(2)(I).  We disagree.  "As a general rule, errors in jury instructions do not amount to constitutional error sufficient to merit postconviction review."  *People v. Sherman*, 172 P.3d 911, 916 (Colo. App. 2006).  In any event, Miller already had the opportunity to challenge the instruction in a postconviction motion.  In his first postconviction motion, Miller raised an issue related to the complicity instruction.  *See Miller II*, ¶ 30 (noting that Miller hadn't challenged the complicity instruction itself).  And he hasn't demonstrated that this claim falls into one of the exceptions in Crim. P. 35(c)(3).  Thus, we conclude that the postconviction court didn't err by denying Miller's claim about the complicity instruction because it was successive.  *See Moody v. People*, 159 P.3d 611, 615 (Colo. 2007) (appellate court may affirm on any basis supported by the record).  Because the claim is successive, we decline to address its merits.

## VI. Disposition

¶ 38    The postconviction court's order is affirmed.

JUDGE LIPINSKY and JUDGE JOHNSON concur.