22CA1683 Peo v Pelaccio 09-12-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1683
El Paso County District Court No. 20CR3390
Honorable William B. Bain, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jesse Edward Pelaccio,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

---

Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jesse Edward Pelaccio, appeals his convictions, contending that the district court erred by (1) admitting a prosecution expert's testimony; (2) refusing to admit his alternate suspect's confession as an excited utterance; and (3) violating his constitutional right to be present for all critical stages of trial by taking the jury's verdict in his absence.  We reject each contention and affirm the judgment of conviction.

## I.    Background

¶ 2    On May 14, 2020, in Colorado Springs, a teenage boy, his brother, and a friend were taking turns riding a dirt bike around a small dirt track in a field behind Pelaccio's house around 8:00 p.m.  As the teen victim rode the bike around the track, he described hearing a "loud ping," though he did not think much of it, assuming a rock had struck the bike's frame.  Thirty or forty seconds later, the victim switched with his brother, who started to ride the bike while the victim waited for his next turn.  While the victim was standing near the track, he felt the impact of what he thought was a BB gun but heard no gunshot.  He and his friend ran for cover before he felt blood running down his arm, while his brother drove

the dirt bike down a nearby street to meet them once he realized what happened.

¶ 3     The victim and his brother testified that Pelaccio approached them after the victim's brother yelled, "Hey, are you the one shooting?" Pelaccio responded: "No one is shooting. I'm trying to put my kid to sleep. Why are you guys riding dirt bikes here?" The victim's brother testified that, without being prompted, Pelaccio said, "I don't even own a rifle." According to the victim, Pelaccio urged them to come to his house because he was an army medic and would remove the bullet. The victim's brother also testified that Pelaccio "kept touching [the victim's] wound" without gloves.

¶ 4     The victim said that Pelaccio persistently urged the teens not to go to the hospital because it would "open an investigation" and would be a "hassle." The victim testified that Pelaccio seemed more concerned about retrieving the bullet than about his well-being. After refusing Pelaccio's offer to remove the bullet, the victim traveled to the hospital where the wound proved to be caused by a .22 caliber bullet. The bullet was removed about a month later.

¶ 5    Pelaccio's friend, Dacoda Hensel, was living with Pelaccio on the day of the shooting and provided his recollection at trial.[1] Hensel testified that he remembered Pelaccio "running" out the front door of the house, with Hensel and Pelaccio's wife following him, before Pelaccio returned and told them to stay in the house.[2] He also said that he saw Pelaccio speaking with two people in the field behind the house. Hensel then testified, and video surveillance confirms, that minutes after the shooting, Pelaccio began collecting incriminating items, including a .22 caliber rifle, an ammo box, and ammunition from his gun safe. Hensel also testified that he helped Pelaccio look for .22 shell casings in the backyard,[3] before another friend, Patrick Defile, arrived. Defile testified that Hensel placed a .22 caliber rifle and "small caliber things" into his truck.[4]

---

[1] Hensel was granted immunity for his testimony shortly before trial.

[2] Pelaccio's home surveillance system captured footage showing that Hensel went to the field, then returned to the house to change his clothes and exited his room with a handgun in his waistband before he and Pelaccio's wife left the house, and Pelaccio returned.

[3] Surveillance footage showed that Hensel went to the backyard, searched the ground with a phone flashlight, and then deposited some small items into an ammo box.

[4] Defile also testified after being granted immunity.

¶ 6    Hensel later testified that, on Pelaccio's instruction, he met with Defile on the side of a road to reacquire the items, with Defile passing Hensel a trash bag. Pelaccio instructed Hensel to drive alone and take the trash bag to Penrose, Colorado, a rural area about an hour away. But when mechanical issues caused Hensel to stop at a gas station, Pelaccio came and helped restart the truck. Pelaccio then drove Hensel to his friend John Koehn's house.

¶ 7    At Koehn's house, Hensel and Pelaccio hid the trash bag in a crevice between rocks and covered the crevice with additional rocks. Hensel later took police to this location and inside the bag was a .22 caliber Ruger rifle; a rifle suppressor; and an ammo box containing a .22 caliber handgun, ammunition, and another rifle suppressor, all owned by Pelaccio.

¶ 8    Before the shooting, Pelaccio had called the police several times to report individuals making noise and riding dirt bikes in the field behind his house. When police came to speak to Pelaccio days after the shooting — with a warrant to recover surveillance

equipment at his home — he told police that he did not own any .22 caliber firearms, and his surveillance system was not plugged in.[5]

¶ 9     However, a police officer in the Digital Forensic Unit testified that the digital video recorder system from Pelaccio's home surveillance system contained footage from May 14, 2020, that had been reformatted but was recoverable.  Pelaccio's surveillance cameras (installed on the exterior and interior of his house) captured the events inside the house and on the field.  The footage from an exterior camera shows that at 7:52 p.m., a teen first appears on a dirt bike in the field.  At 8:01 p.m., a dirt biker is seen driving on the road along the fence immediately behind Pelaccio's house, matching the victim's brother's testimony — thus by 8:01 p.m., the victim had been shot.

¶ 10    Inside the home, the cameras show Pelaccio retrieving a rifle with a scope and suppressor from his ground-floor-level gun safe next to his back door at 7:56 p.m., before going to his garage with the rifle.  From his garage he enters a chicken coop in the backyard, then returns to his garage without the rifle between 7:56 and 7:57

---

[5] Government records proved that Pelaccio owned the .22 Ruger rifle recovered from the rocks on Koehn's property.

p.m. Pelaccio then goes back through the garage to the chicken coop before returning to the garage with the rifle between 7:57 and 7:58 p.m. From the garage he then goes to his back door by the gun safe, stands for a moment, and sets the rifle down to look through the glass. He then opens the interior back door and slides down the top window portion of the exterior storm door. Pelaccio next steps out to his backyard for a few seconds before returning to the back door at 8:00 p.m.

¶ 11     Five seconds later he stabilizes the rifle on the lowered back storm door window — extending the barrel through the open portion looking through the scope of his rifle in the direction of the field — and appears to pull the trigger.[6] Over the next half hour, Pelaccio and Hensel go to the field before returning to the house to begin collecting the incriminating items.

¶ 12     The jury found Pelaccio guilty of attempt to commit second degree murder with two crime of violence sentence enhancers for using a deadly weapon which caused serious bodily injury, first

---

[6] Police photographs and laser-imaging tools indicated that the victim, according to the victim's general approximation of his location when he was shot, would have been visible from Pelaccio's back door. A defense expert challenged this conclusion.

degree assault with the same sentence enhancers, tampering with physical evidence, and tampering with a witness. The district court sentenced Pelaccio to serve twenty-two years in the custody of the Department of Corrections, plus three years of parole. This appeal followed.

## II.    Analysis

¶ 13    On appeal, Pelaccio raises three issues arguing that the district court erred by (1) admitting the prosecution's rebuttal expert witness's testimony; (2) refusing to admit the defense's proffered testimony concerning Hensel's alleged confession as an excited utterance; and (3) allowing the jury to give the verdict in his absence, violating his right to be present for all critical stages of trial. We affirm.

### A.    The Prosecution Expert's Rebuttal Testimony Was Relevant

¶ 14    Pelaccio first argues that a prosecution rebuttal expert's testimony was irrelevant because it was not "useful" for the jury, and therefore inadmissible, because he (1) used a different model .22 caliber rifle than Pelaccio used; (2) possibly used different ammunition; and (3) called it an "experiment" implying reliability. Thus, he contends that the challenged testimony only confused the

jury, was inadmissible under CRE 702, and did not rebut the defense expert's testimony. Further, Pelaccio argues that even if the testimony was admissible, it was overly prejudicial and violated CRE 403.

### 1. Additional Facts

¶ 15 Pelaccio's main defense at trial was that he could not have fired the shot that hit the victim, arguing that his alleged vantage point and the type of gun used made it impossible. Instead, Pelaccio contended that Hensel used an unrecovered .22 caliber rifle to shoot the victim from the kitchen window on the second floor. Pelaccio's primary expert and fact witness to support this theory, Norvell West, was admitted as "an expert in the fields of ballistics materials, telemetry, and shot replication and experimentation." West also described himself as a mentor to Pelaccio. On cross-examination, West testified that he had known Pelaccio since he was in high school, that Pelaccio had dated his daughter, and that West's and Pelaccio's fathers had worked together.

¶ 16 During the expert portion of West's testimony, West said the odds of Pelaccio being able to shoot the victim as the prosecution

alleged was "600,000 to 1." This conclusion was based on testing West had overseen at an outdoor shooting range his company owned, where a marksman fired Ruger-brand .22 caliber rifles at a mannequin placed 188 yards away (the approximate distance between Pelaccio and the victim). The first rifle was a "breakdown Ruger" .22 caliber long range rifle that was the "same general make and model" as Pelaccio's, which West described as "the best replica of [Pelaccio's] weapon we could find," and they used lead subsonic .22 caliber long range ammunition, the same kind as recovered from the victim and owned by Pelaccio. West's marksman reportedly could not hit the mannequin using the breakdown Ruger at 188 yards and reported "feed issues" when reloading. In another test, using a more expensive and higher quality Ruger rifle and higher quality copper ammunition, West reported that the marksman hit the target.

¶ 17     West also testified that only with the higher quality Ruger rifle and copper ammunition could his marksman reliably penetrate a hoodie sweatshirt on the mannequin (simulating the victim's outfit) at 188 yards, noting that some of the shots failed to penetrate the

9

fabric. West ultimately opined that the rifle recovered by police did not cause the victim's injuries.

¶ 18 To rebut West, the prosecution called Sergeant Paul Malchow, who was admitted as an expert "in firearms and long range shooting." Malchow testified that he conducted a range test using "a standard Carbine .22" without any modifications, a "stock rifle just to make it as close to what anybody" could pick "up off the shelf" from any sporting goods store "with a relatively inexpensive scope [to] replicate" a similar shot. Malchow also testified that he used ammunition in evidence "seized from [Pelaccio]." Using this rifle and ammunition, Malchow testified that he hit a paper torso target ten out of ten times at 188 yards using a stabilized bench and four out of five times from a standing position stabilizing the rifle on a fencepost, without misfires or feed issues. As to the ammunition's penetration capabilities, Malchow testified that the latter five of his shots penetrated a three-quarter-inch piece of plywood placed behind the paper target.

¶ 19 Malchow concluded that the shot was possible and that he could train "just about anybody" to make such a shot. Malchow

also agreed on redirect that, in his opinion, a .22 caliber rifle could harm or kill a person from 188 yards away.

¶ 20 Malchow also testified that the rifle he used was "similar" to Pelaccio's, although Pelaccio's "ha[d] a barrel that [wa]s removable from the action or the receiver of the gun" while Malchow's had a fixed barrel. Malchow admitted that Pelaccio's rifle was possibly "slightly less accurate" than the one he used in his testing. But on redirect, Malchow testified that he felt that using the exact same model gun was unnecessary as they were similar enough.

¶ 21 When cross-examined about the type of ammunition he used, Malchow testified that there were three boxes of ammunition in evidence and that he used "only ammunition that looked like the hollow point ammunition specified on the packaging." He added that he could not "with 100 percent certainty" be sure that the ammunition he used was what the box purported it to be, and he did not use a chronometer to measure the speed of the bullets. From his experience Malchow was confident it was subsonic ammunition, and he testified that the box of ammunition he used did not contain "mixed ammunition."

## 2. Standard of Review and Applicable Law

¶ 22 We review a district court's decision to admit expert testimony for an abuse of discretion, which occurs when its "ruling was manifestly arbitrary, unreasonable, or unfair, or if it misapplied the law." *People v. Lowe*, 2020 COA 116, ¶ 26. "[A] trial court has broad discretion to determine the admissibility of expert testimony." *Id.* at ¶ 28.

¶ 23 CRE 702 permits a qualified expert witness to testify if his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." "When an expert's testimony is scientific in nature, the evidence must be relevant and reliable to be admitted." *Lowe*, ¶ 28.

¶ 24 Pelaccio only challenges the relevance of Malchow's testimony, so "[t]o determine relevancy under CRE 702, the court should consider whether the expert testimony would be useful to the fact finder." *People v. Ramirez*, 155 P.3d 371, 379 (Colo. 2007). In this context, "[u]sefulness means that the proffered testimony will assist the fact finder to either understand other evidence or to determine a fact in issue. Usefulness thus hinges on whether there is a logical relation between the proffered testimony and the factual issues

12

involved in the case." *Id.* (citation omitted). But expert testimony admissible under CRE 702 must still have probative value not substantially outweighed by its risk of prejudice in accordance with CRE 403. *Id.* "Essentially, evidence should be excluded when it has an undue tendency to suggest a decision on an improper basis." *Id.*

### 3. Analysis

¶ 25 Malchow's expert testimony was useful because it helped the jury assess West's testimony, and it was logically related to disputed issues in the case — whether Pelaccio could have shot and injured the victim. *See id.*

¶ 26 Malchow's testimony rebutted West's testimony implying that Pelaccio could not have shot the victim because (1) the rifle was physically incapable of hitting a target at that range even in the hands of a trained marksman; and (2) even if it had hit the victim, the bullet likely would not have penetrated the victim's sweatshirt. Malchow's testimony simply informed the jury that another trained marksman easily hit the target with a similar, albeit more accurate, .22 caliber rifle in a shooting test. Further, the ammunition seemed capable of penetrating the victim's sweatshirt because it went

through plywood.  Therefore, it provided the jury with information to weigh against West's testimony.  *See id.*

¶ 27     And to Pelaccio's CRE 403 concerns, Malchow's testimony did not have an "undue tendency to suggest a decision on an improper basis" risking unfair prejudice.  It was merely evidence detailing the results of another marksman's shooting test that were contrary to West's.  *See Ramirez*, 155 P.3d at 379; *see also People v. Hulsing*, 825 P.2d 1027, 1031 (Colo. App. 1991) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action.").

¶ 28     Malchow conceded that (1) the type of rifle he used could have been more accurate than Pelaccio's because of its fixed barrel, and (2) he was not 100% certain that he used the exact same type of subsonic ammunition retrieved from the victim.  Indeed, in cross-examination, the defense aptly summarized the issue by asking of Malchow's testing: "So it's a close approximation of the rifle and maybe the right ammunition, right?"  To which Malchow responded: "Yes."

14

¶ 29    Pelaccio's contentions about the differences in the rifles and ammunition go to the weight of Malchow's testimony rather than its relevance or admissibility. *See People v. Shanks*, 2019 COA 160, ¶ 12 ("Concerns about conflicting opinions or whether a qualified expert accurately applied a reliable methodology go to the weight of the evidence, not its admissibility."). "Such concerns 'are adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *People v. Campbell*, 2018 COA 5, ¶ 42).

¶ 30    The jury heard robust cross-examination revealing the defense's concerns with Malchow's methodology, and the defense was able to present a contrary view through their own expert. Further, the jury received the explicit instruction that it could believe all, some, or none, of an expert witness's testimony and decide the weight it gave various experts' testimony. *See Washington v. People*, 2024 CO 26, ¶ 31 ("Absent evidence to the contrary, we presume the jury understood and followed the court's instructions.").

¶ 31    The district court did not abuse its discretion by admitting Malchow's expert testimony. *See Lowe*, ¶ 26.

B.     Hensel's Alleged Confession was Not an Excited Utterance

¶ 32     Next, Pelaccio contends that the district court erred by refusing to admit West's testimony that Hensel allegedly confessed to shooting the victim to West on the telephone, arguing that while the alleged confession was hearsay, it should have been admitted as a CRE 803(2) excited utterance.  Pelaccio argues that Hensel's statements, despite being made over four hours after the shooting, were spontaneously made in response to the startling event of the shooting and extended evidentiary cleanup and were accompanied by signs of Hensel's emotional distress.

1.     Additional Facts

¶ 33     Pelaccio wanted West to testify about a phone call Pelaccio made to West late at night after the shooting (around 2:30 a.m. in Virginia where West lived, 12:30 a.m. in Colorado), during which Pelaccio asked West to speak to Hensel, who then allegedly confessed to the shooting.  The prosecution objected, arguing the testimony was hearsay, while the defense responded that it was

16

admissible as a present sense impression and as an excited utterance.[7]

¶ 34    The defense argued that West could testify that Hensel was "yelling," "panicked," and "practically foaming at the mouth." Despite the court pointing out that the phone call was made several hours after the shooting, the defense argued it remained an excited utterance based on the "startling event or condition being that [Hensel] shot a young man earlier that night." The defense argued that the hurried efforts to conceal the evidence afterwards could likewise be startling events.

¶ 35    The prosecution countered that the long timeframe was sufficient for evidentiary fabrication to occur, especially given that Hensel and Pelaccio had already tried to hide evidence of the shooting by removing incriminating items from the house.

¶ 36    The district court ultimately refused to admit the testimony as an excited utterance, highlighting that four and a half hours had

---

[7] On appeal, Pelaccio does not contend that the testimony should have been admitted as a present sense impression. *See Moody v. People*, 159 P.3d 611, 614 (Colo. 2007) (It is a "basic principle of appellate jurisprudence that arguments not advanced on appeal are generally deemed waived.").

elapsed between the shooting and the phone call and that Pelaccio and Hensel engaged in a "fair amount of planning" to hide evidence during that time.

### 2. Standard of Review and Applicable Law

¶ 37   We review a district court's decision to admit or exclude evidence for an abuse of discretion. *People v. Pernell*, 2014 COA 157, ¶ 30, *aff'd*, 2018 CO 13.

¶ 38   CRE 803(2), a hearsay exception, provides that "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are admissible at trial. An excited utterance "is admissible even though the declarant is available as a witness." *People v. Martinez*, 18 P.3d 831, 835 (Colo. App. 2000). The proponent of a purported excited utterance must establish three conditions:

> (1) the event was sufficiently startling to render normal reflective thought processes of the observer inoperative; (2) the statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence exists to allow the jury to infer that the declarant had the opportunity to observe the startling event.

*People v. Vanderpauye*, 2023 CO 42, ¶ 42.

18

¶ 39    Where "the circumstances surrounding an excited utterance 'eliminate the possibility of fabrication, coaching, or confabulation,' they lend sufficient trustworthiness to overcome the hearsay rule's proscription." *Id.* at ¶ 41 (quoting *Idaho v. Wright*, 497 U.S. 805, 820 (1990)).

### 3.    Analysis

¶ 40    Pelaccio's main argument is that, despite the four-and-a-half-hour delay between the shooting and the phone call, Hensel remained under the stress of the startling event — having allegedly shot someone and then cleaned up the evidence.  Thus, Hensel could not engage in reflective thought and his alleged confession was spontaneous.

¶ 41    Pelaccio is correct that the time frame in which the statement is made is not dispositive.  *See People v. Lagunas*, 710 P.2d 1145, 1148 (Colo. App. 1985).  But because the statements occurred well after the events and after Hensel helped hide evidence of the shooting, they were sufficiently detached from the startling events to allow for a normal reflective thought process and, thus, lacked the indicia of trustworthiness and low probability of fabrication that characterizes an excited utterance.

19

¶ 42    The post-shooting videos clearly show Hensel and Pelaccio engaging in, as the district court put it, a "fair amount of planning" for an evidentiary coverup.  The district court was in the best position to consider the effect of the alleged startling events on the declarant, and the record strongly supports the court's decision that the statement was not a spontaneous reaction to a sufficiently startling event.  *See People v. Martinez*, 83 P.3d 1174, 1177 (Colo. App. 2003); *People v. King*, 121 P.3d 234, 238 (Colo. App. 2005).

¶ 43    Where a declarant actively and demonstrably engaged in a coverup before allegedly making the challenged statement, a higher possibility of fabrication exists.  *See Vanderpauye*, ¶ 41.  This is particularly true when, according to West, Pelaccio called West asking him to speak to Hensel so that Hensel could then confess.  Here, Hensel's alleged statement does not qualify as an excited utterance.

¶ 44    This is true even considering West's testimony that Hensel was "panicked" and "practically foaming at the mouth" when he spoke with him over the phone.  That Hensel was upset does not mean that his confession is an excited utterance free from reflective thought.  *See Pernell*, ¶ 34 (sexual assault victim's statements

twelve hours after the events, despite her demeanor being described as "distraught," "traumatized," and "terrified," were not admissible as excited utterances because evidence indicated that she had been able to engage in reflective thought — including going home, speaking with her boyfriend, and changing her clothes — making her statements nonspontaneous); *see also People v. Stephenson*, 56 P.3d 1112, 1115 (Colo. App. 2001) (wife's statements made three hours after witnessing a shooting and after speaking to friends, going to her mother's home and work, and speaking with her daughter were too far removed from the startling event allowing for reflective thought and, thus, were not excited utterances despite officers describing her demeanor as "bordering on panic").

¶ 45 As a result, the district court did not err by refusing to admit Hensel's alleged confession to West as an excited utterance. *See Pernell*, ¶ 30. And because Hensel's alleged confession was not an excited utterance and was thus inadmissible, the trial court also did not violate Pelaccio's constitutional right to present a defense. *See People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003) ("[T]he right to present a defense does not guarantee a defendant a right to

21

question witnesses in violation of the rules of evidence or to produce inadmissible hearsay.").

## C. Pelaccio's Absence During the Jury's Verdict Was Harmless

¶ 46 Finally, Pelaccio argues that because his absence for the verdict — after being taken to the hospital due to a medical issue — was involuntary, his right to be present for this stage of trial was violated. Pelaccio argues he was prejudiced because his presence could have "psychologically influence[d]" the jury and urges us to reject the holding in *People v. Burnell*, 2019 COA 142, because the case impermissibly shifts to the defense the burden of proving the harmlessness of a defendant's absence from trial proceedings.

### 1. Additional Facts

¶ 47 After the jury went to deliberate, the district court told the parties to remain within ten minutes of the courthouse. As deliberations continued and the jurors raised three questions, Pelaccio personally waived his right to be present for "subsequent juror questions," which the court accepted as a knowing and intelligent waiver. The jury later reached a verdict — but Pelaccio was not present for the jury's verdict or polling because he "had a medical incident in the hallway outside the courtroom that led to

22

[the district court] clerk calling 911. And the fire crew and the ambulance crew came and took Mr. Pelaccio away, presumably, to the hospital."[8] The record contains no further information on what precisely happened to Pelaccio in the hallway, or the severity of the incident, though Pelaccio's counsel confirmed to the court that his client had been taken to the hospital. After the verdict's announcement, the defense asked for a poll, and each juror confirmed the verdict.

### 2. Standard of Review and Applicable Law

¶ 48    "Article II, section 16, of the Colorado Constitution, and the Due Process Clause, as well as the Sixth Amendment to the United States Constitution, guarantee the right of a criminal defendant to be present at all critical stages of the prosecution." *People v. White*, 870 P.2d 424, 458 (Colo. 1994). This includes from the time a jury is impaneled until the jury renders the verdict. *Burnell*, ¶ 6. "This

---

[8] There was confusion concerning the timeline of these events, but a supplementary and corrected court transcript resolved these issues. According to the corrected transcript, at 1:22 p.m. on May 20, 2022, the court returned from recess to discuss the submitted juror questions and then took another recess after Pelaccio waived his right to be present for further juror questions at 1:40 p.m. The court noted that the medical incident occurred "around 4:00 to 4:10 [p.m.]" The jury gave their verdict after 4:48 p.m.

23

right is personal to the defendant, and counsel may not waive it for the defendant. That said, the right to be present is not absolute. A defendant may waive [his] right to be present either expressly or through [his] conduct." *People v. Janis*, 2018 CO 89, ¶¶ 16-17 (citations omitted).

¶ 49 "Whether proceeding with trial in the absence of the defendant was appropriate . . . rests on whether the trial court correctly determined that the defendant waived his right to be present by *voluntarily* absenting himself." *Burnell*, ¶ 8. In the context of medical issues specifically, a division of this court in *Stephenson* held that "absence from trial compelled by medical necessity may generally be deemed voluntary [but] determining whether a defendant is 'voluntarily absent' . . . requires a fact-specific inquiry into the type of medical condition and the circumstances surrounding [the] absence." *People v. Stephenson*, 165 P.3d 860, 870 (Colo. App. 2007).

¶ 50 "Whether a trial court violated a defendant's constitutional right to be present at trial is reviewed de novo." *Janis*, ¶ 14. "Where preserved, error in the denial of a defendant's right to be present is reviewed for constitutional harmless error." *Burnell*, ¶ 8.

24

"These errors require reversal unless the reviewing court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Hagos v. People*, 2012 CO 63, ¶ 11 (alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

¶ 51    Pelaccio's counsel did not object to the jury delivering the verdict in Pelaccio's absence.  But because Pelaccio was taken to the hospital and could not have personally agreed to the jury reading the verdict without him, and counsel cannot waive his right to be present for critical proceedings, we conclude that we must review any error for constitutional harmless error.  *See* Crim. P. 51 ("[I]f a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him.").

### 3.    Analysis

¶ 52    The district court did not probe the details of the medical issue.  Even so, it is enough for us to know that Pelaccio was taken to the hospital after the clerk called 911, indicating symptoms sufficiently severe for an objective observer to believe emergency medical attention was necessary.

¶ 53    While the division in *Stephenson* did not differentiate between a medical condition caused by a defendant's voluntary conduct and

an unexpected medical condition, the cases it relies on focus on medical issues that are, at least in part, caused by the defendant. *See* 165 P.3d at 869-70 (collecting federal and state cases where a defendant's absence from trial due to a medical condition may be a voluntary absence); *United States v. Edwards*, 303 F.3d 606, 624-29 (5th Cir. 2002) (holding that a defendant's absence from trial due to a serious heart condition requiring surgery was voluntary because the record supported that the defendant avoided scheduling his surgery earlier, against the advice of medical professionals, as part of a deliberate and informed trial strategy); *State v. Clark*, 2005 MT 169, ¶¶ 5, 15-16, 327 Mont. 474, 115 P.3d 208 (defendant was voluntarily absent for trial after he "unnecessarily" checked himself into the hospital after an alleged "history of continuing trials on the basis of a physical ailment," without "verification of his ailment").

¶ 54    We conclude that the record here does not support the conclusion that Pelaccio's absence was voluntary.  A defendant who unexpectedly requires emergency medical attention and hospitalization — without any evidence that the emergency resulted from a strategic ploy or the defendant's intentional actions —

cannot be a voluntary absence. Even if Pelaccio waived his right to be present for jury questions, he never waived his right to be present for the verdict's announcement.

¶ 55   The district court never made a finding that Pelaccio's absence from trial was voluntary, nor did it inquire, on the record, into the details of the absence. Thus, the district court erred by taking the verdict without ascertaining if Pelaccio's absence was voluntary. *See Burnell*, ¶¶ 13-17.

¶ 56   The question then is whether Pelaccio's absence was harmless. Pelaccio asks us to depart from *Burnell,* where the division concluded that the district court erred when it failed to inquire into why a defendant appeared late to the jury verdict and, instead, assumed that the absence was voluntary. *See id.*

¶ 57   The defendant there argued that he could not poll the jury (because his counsel declined to conduct a poll while he was gone) but if he had, his presence could have swayed a juror to change their mind — much like Pelaccio's argument here. *See id.* at ¶¶ 18-20. But the division found that the error was harmless because "any suggestion that a poll of the jury could have altered the outcome is wholly speculative." *Id.* at ¶ 21.

¶ 58    As to Pelaccio's burden shifting point, the *Burnell* division recognized "that it is not [the defense's] burden to demonstrate harm here.  Rather, the People must prove harmlessness of constitutional error beyond a reasonable doubt."  *Id.* at ¶ 22.  But the division concluded that "demonstrating constitutional harmlessness does not require dispelling wholly speculative concerns."  *Id.*  The division also noted that in cases where there is a "reasonable possibility" an error may have contributed to the defendant's verdict, such as where a jury required instruction on a deadlock or a particular juror expressed hesitancy in a poll, the error might not be harmless.  *Id.* at ¶¶ 23-24.

¶ 59    *Burnell* is well reasoned, and we see no reason to depart from it.  Like in *Burnell*, Pelaccio requests we reverse his convictions on the wholly speculative grounds that his presence might have caused a juror to change their mind.  But Pelaccio points us to three juror questions as proof that the jury was struggling to convict Pelaccio:

> Can we hear the evidence associated with the charge of Tampering with a Witness, on or about September 14, 2020?
>
> [I]s the witness connected to the charge of Tampering with a Witness at or about 14 September of 22, 2020, Patrick Defile?

28

> And what exhibit numbers are associated with the charge of Tampering with a Witness?

To be fair, *Burnell* indicated that a reasonable possibility that the error contributed to the verdict may occur when the record demonstrates "the existence of jury questions that reflect juror reluctance." *Id.* at ¶ 24. But these questions reflect the jury's requests for information or clarification, which do not, without more, reflect that the jury was deadlocked or flummoxed. And, unlike in *Burnell*, Pelaccio's counsel requested a poll of the jury, and there is nothing we can discern from the record in terms of the tone or demeanor of the jury that reflects any hesitance.

¶ 60    We agree with *Burnell* that constitutional harmlessness does not require the prosecution to refute wholly speculative concerns, especially when the only record evidence is a polled unanimous jury verdict that contradicts Pelaccio's speculative concerns. *See id.* at ¶¶ 22-24. In accordance with *Burnell* we conclude that, though the district court erred, the error was harmless beyond a reasonable doubt.

## III. Disposition

¶ 61    We affirm the judgment of conviction.

JUDGE JOHNSON and JUDGE SCHOCK concur.